**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MORRIS JERMAINE THOMAS,      *
# 262097,                    *
                             *
     Plaintiff,              *
                             *   CIVIL ACTION NO. 20-00300-KD-B
vs.                          *
                             *
CYNTHIA D. STEWART,          *
                             *
     Defendant.              *

## REPORT AND RECOMMENDATION

Plaintiff Morris Jermaine Thomas, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. (Doc. 1). This action has been referred to the undersigned Magistrate Judge for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) and is now before the Court on Defendant's motion for summary judgment. (Doc. 11). For the reasons discussed herein, it is recommended that the motion for summary judgment be **GRANTED**, and that this action be **DISMISSED**.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Thomas's Complaint.

Plaintiff Morris Jermaine Thomas ("Thomas") brings this suit against Defendant Warden Cynthia Stewart ("Warden Stewart") for deliberate indifference in failing to protect him from an inmate

attack on May 28, 2019, in violation of the Eighth Amendment.  (See Doc. 1).[1]

In his complaint,[2] Thomas alleges that while incarcerated at Holman Correctional Facility ("Holman"), he was sitting in the dining hall eating breakfast when an inmate, who worked in the kitchen, jumped over a ten-foot wall separating the cooking/serving area from the seating area[3] and stabbed Thomas twice with an inmate-made knife.  (Id. at 4-5, 8).  According to Thomas, he felt something hit him in his head and then his shoulder, and he "instantly jumped up and turned around and noticed an inmate" holding a knife.  (Id. at 8).  Thomas looked around for help but

---

[1] Thomas's complaint alleges that the incident occurred on "June 2 or 6 2019" (Doc. 1 at 4), but the institutional records submitted by Warden Stewart reflect that the incident occurred on May 28, 2019.  (See Doc. 10-1 at 8-15; Doc. 17-1 at 8-22).  Thomas now acknowledges that the incident took place on May 28, 2019.  (See Doc. 14-1 at 5).

[2] Because Thomas's complaint was signed under penalty of perjury (see Doc. 1 at 7), the factual allegations in the complaint may be used as an affidavit opposing the motion for summary judgment. See Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam).  To function as an opposing affidavit, a complaint must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  Accordingly, the Court will consider the portions of Thomas's complaint that meet these requirements in ruling on the motion for summary judgment.

[3] Thomas does not allege that he saw his assailant at any point prior to the stabbing; rather, he states that he was later told that the inmate jumped over the serving wall to attack him.  (See Doc. 1 at 8).

saw no officers available, so he ran into the hallway and into the shift office, where he encountered the shift supervisor.[4] (Id. at 4-5, 8). The officers then apprehended his assailant and took Thomas for medical attention. (Id. at 8). Thomas is suing Warden Stewart for "Lack of Security" and is "seeking a million dollars cash." (Id. at 5, 7).

**B.   Warden Stewart's Answer and Special Report.[5]**

In her answer to Thomas's complaint, Warden Stewart acknowledges that Thomas was stabbed twice by another inmate (once in the back of the head and once in the left shoulder) while he was eating breakfast in Holman's dining hall on May 28, 2019. (Doc. 9 at 1). However, Warden Stewart denies that she had any prior

---

[4] Thomas alleges that while he was fleeing, he "took a look back behind [him] and noticed that same inmate that stuck [him] running behind [him] try[ing] to stab [him] again." (Doc. 1 at 8).

[5] Warden Stewart filed her original special report and accompanying exhibits on March 10, 2021. (Docs. 10, 10-1). After Thomas pointed out that the Duty Post Log submitted with the original special report was incomplete (see Doc. 14-1 at 6), Warden Stewart filed a motion for leave to amend and supplement her special report and attached a proposed amended and supplemented special report. (Docs. 15, 15-1, 15-2). The proposed amended and supplemented special report was identical to the original special report, except that it corrected several non-substantive errors in the original special report and included the complete redacted Duty Post Log. (Compare Docs. 10, 10-1, with Docs. 15-1, 15-2). The Court granted Warden Stewart's motion and directed the Clerk to docket the proposed amended and supplemented special report as an amended and supplemented special report. (Doc. 16). To avoid confusion and duplication, the Court will cite only to Warden Stewart's amended and supplemented special report and accompanying exhibits (Docs. 17, 17-1) in this report and recommendation.

knowledge of any specific threat to Thomas or that there was a lack of security present in the dining hall at the time of the incident.   (Id. at 2).   Warden Stewart further denies the other substantive allegations asserted in Thomas's complaint and asserts all available immunity defenses.   (Id. at 2-3).   Warden Stewart filed a supporting special report and attached as exhibits her sworn affidavit, the Incident Report, the Duty Officer Report, Thomas's Body Chart, the Evidence Form for the weapon used to stab Thomas, the Use of Force Investigative Report, the Duty Post Log, and the Post Assignment Roster.   (Docs. 17, 17-1).

In her affidavit, Warden Stewart affirms that she was the warden of Holman prior to and on the date of the subject incident, and that she was not present and was not the On-Call Duty Official at Holman when the incident occurred.   (Doc. 17-1 at 2-3).   Warden Stewart further states that the Incident Report reflects that there was a correctional officer present in the kitchen when the incident occurred, who "observed the incident, immediately called for assistance by calling a 'Code Red' and multiple officers responded to deal with the situation."   (Id. at 3).   Warden Stewart notes that the institutional records reflect that Thomas's assailant had to be pepper-sprayed before he dropped the knife; that both inmates were restrained; and that Thomas was taken to the Health Care Unit, treated for superficial wounds, and returned to his housing unit. (Id.).

Warden Stewart avers that Holman has several procedures in place to reduce incidents such as stabbings.[6] (Id. at 4). She states that frequent unannounced searches are conducted of an inmate's person, inmate living areas, and other areas of the facility; that all officers are required to conduct at least five random searches of inmates, their personal property, and their assigned living areas per day; and that monthly area searches of Holman are also conducted. (Id.). Warden Stewart also states that a review of the post assignments for the date in question reflects that there were an adequate number of staff on duty to provide security. (Id.). Finally, Warden Stewart avers that she "had no prior knowledge or information to believe that there was any specific threat to Inmate Thomas before the incident in question." (Id. at 5).

The Incident Report reflects that at approximately 4:45 a.m. on May 28, 2019, Correctional Officer Arielus Bercant was providing security inside the kitchen during the breakfast meal when he observed inmate Isiah Carter jump over the serving wall and stab Thomas with a weapon. (Id. at 8). Officer Bercant called a Code Red inside the kitchen, and Correctional Officers Rodney Colvin,

---

[6] Warden Stewart states that every inmate incarcerated by the Alabama Department of Corrections is oriented with an inmate handbook, which sets forth ADOC's major rules, regulations, and policies that apply to all inmates and are designed to help the inmate population live together as safely and comfortably as possible. (Doc. 17-1 at 4).

Donnie Stewart, Marquino Siler, and Labryson Hudson[7] reported to the main hall. (Id.). After inmate Carter refused to comply with several direct orders from Officer Bercant to put the weapon down, Officer Bercant administered a two-second burst of Sabre Red pepper spray to inmate Carter's facial area. (Id.). Inmate Carter dropped the knife[8] to the floor, and Officer Bercant retrieved it. (Id.).

Both Thomas and inmate Carter were restrained and questioned. (Id.). Thomas denied any knowledge of why inmate Carter had assaulted him, while inmate Carter stated that Thomas had threatened him with a knife prior to the incident. (Id.). Thomas was escorted to the Health Care Unit, where a medical assessment revealed puncture wounds to his head and left shoulder. (Id.). Inmate Carter was placed in a Restrictive Housing Unit cell. (Id.). Thomas was released back to his assigned housing unit. (Id. at 9).

The Holman Post Assignment Roster (for the night shift on May 27-28, 2019) reflects that Lieutenant Kidd was assigned as the

---

[7] The Post Assignment Roster and Duty Post Log reflect that Officer Colvin was the Dorm B Rover but was assigned to the chow line during feeding of the breakfast meal; Officer Stewart was assigned to Cubicle #4; Officer Siler was assigned as the Death Row Rover; and Officer Hudson was assigned as the Segregation Rover. (Doc. 17-1 at 15, 21).

[8] The knife was approximately nine inches long and sharpened to a point, with white fabric wrapped around the handle. (Doc. 17-1 at 8, 12).

Population Shift Commander, and that the towers and cubicles were fully manned.[9]   (Id. at 15).   The Duty Post Log reflects that Officer Colvin was assigned to the chow line, Lieutenant Kidd was assigned to the exit door, and Officer Bercant was assigned to the main hall during the population feeding of the breakfast meal. (Id. at 14, 21-22).

Thomas's Body Chart was signed by a nurse at Holman at 4:50 a.m. on May 28, 2019.   (Id. at 11).   It reflects that Thomas was ambulatory, alert, and oriented, that he suffered a 0.5 centimeter puncture to his left shoulder and a 0.8 centimeter puncture wound to the back of his head, and that he stated: "I'm alright."   (Id.).

### C.   Conversion to Motion for Summary Judgment and Thomas's Response.

In an order dated April 16, 2021 (Doc. 12), the Court converted Warden Stewart's answer and special report into a motion

---

[9] The prison was staffed as follows: (1) Population Shift Commander – Lt. Kidd, (2) Shift Clerk– Pernell, (3) Rover for Dorm A - Bercant, (4) Rover for Dorm B - Colvin, (5) Rover for Dorm E – Holloway, (6) Hall Rover – E. Dailey, (7) Infirmary Rover – Johnson, (8) Tower 1 - Kyles, (9) Tower 2 - Boutwell, (10) Cubicle 1 – CCO Winner, (11) Cubicle 2 – Graham, (12) Cubicle 3 – CCO Scutchfield, (13) Cubicle 4 – CO Stewart, (14) Cubicle 5 – CCO Sims, (15) Segregation Rover - Hudson, (16) Death Row Rover – Siler. Additionally, there were five officers assigned to Outside Hospital – (1) Lee, (2) Nelson, (3) Pickett, (4) Hard, (5) Price. (Doc. 17-1 at 15).

The records reflect that there were 502 inmates in Population (Dorms A-E), 180 inmates in Segregation, 148 inmates on Death Row, 4 inmates in the Infirmary, and 6 inmates listed under Outgate, for a total count of 840.   (Id. at 14).

for summary judgment (Doc. 11), explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or evidence in support of or in opposition to the motion by June 3, 2021.

Thomas submitted an affidavit in opposition to the summary judgment motion. (Doc. 14-1). In his affidavit, Thomas states that Warden Stewart was the warden at Holman in 2016 when Officer Bettis was killed in Holman's dining hall by an inmate using a prison-made knife. (Id. at 2). Thomas avers that Officer Bettis was the only correctional officer in the dining hall at the time he was killed, and that it is "standard practice" at Holman to "have 125–150 inmates in the dining hall or on line to get a tray with only one officer monitoring the dining hall." (Id.). Thomas states that 25 officers quit on the day of Officer Bettis's death, and "the prison Warden had even less officers to man the required Post." (Id.).

Thomas further asserts that "[d]uring 2016-2020, 2-3 inmates were stabbed every single day in the four dorms (A, B, C, and D)"; 236 inmates were stabbed during the month of September 2016 alone; and because of the high number of inmate stabbings, Warden Stewart ordered her officers not to enter the dorms during inmate violence. (Id.). According to Thomas, officers working the night shift (6:00 p.m. to 6:00 a.m.) "especially adhered" to this order, and the

night shift was always short of officers, "especially officers to man the post in the four dorms (A-D)." (Id.). He asserts that during the night shift, "it was common for the officers to watch" inmate-on-inmate stabbings "from the safety of being behind the gates" and to refuse to intervene in any way as long as an inmate had a knife in his hand. (Id.).

Thomas acknowledges that on the morning of his stabbing, Officer Colvin was assigned to open the kitchen at 2:00 a.m. for inmates to cook the breakfast meal, and Officer Bercant was assigned to monitor the dining hall during the feeding of the breakfast meal. (Id. at 3). According to Thomas, there were "three (3) total officers watching and feeding 460 inmates" in dorms A-D, and "a total of 6 officers watching" all of the inmates "[w]ithin the prison proper[.]" (Id.). Thomas claims "[t]his was how Warden [S]tewart typically manned" the night shifts at Holman from 2016 to 2020. (Id.).

In his affidavit, Thomas also attempts, for the first time, to connect the subject May 2019 stabbing in this case to a prior stabbing that he suffered in December 2018. According to Thomas, he was stabbed by several unknown inmates while sleeping in his dorm at Holman on December 2, 2018. (Id. at 4). Thomas avers that he was hospitalized as a result of that stabbing, and upon his release from the hospital, he was placed in "segregation lockup" for approximately 45 days before being released back into the

general population.   (Id.).   Thomas states that prison officials
never determined who stabbed him in December 2018, and he argues
that Warden Stewart placed him in danger by returning him to the
prison population despite knowing that the inmates responsible for
the December 2018 stabbing had not been identified.   (Id. at 4-
5).[10]

After a thorough review of the parties' submissions, the
motion for summary judgment (Doc. 11) is ripe for consideration.

## II.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the movant shows that there is
no genuine dispute as to any material fact and the movant is

---

[10] The undersigned observes that Thomas's complaint in this case
makes no mention of the December 2018 stabbing or any of the
circumstances surrounding it, including his placement in
segregation and subsequent release into the general population at
Holman.   (See Doc. 1).   Extant case law provides that a plaintiff
is not permitted to raise new claims at the summary judgment stage.
See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th
Cir. 2004) (per curiam) (holding that the liberal pleading standard
for civil complaints "does not afford plaintiffs with an
opportunity to raise new claims at the summary judgment stage");
Joiner v. Mason, 2011 U.S. Dist. LEXIS 55580, at *20 n.6, 2011 WL
2142768, at *6 n.6 (M.D. Ala. May 23, 2011) ("[T]o the extent
plaintiff presents new claims for relief or factual allegations,
additional defendants, and/or additional theories of liability in
his opposition to Defendants' dispositive motion, such claims are
not properly before the court nor did the court consider
Plaintiff's opposition as an amendment to his complaint.); Jacoby
v. Jones, 2018 U.S. Dist. LEXIS 138080, at *10 n.2, 2018 WL 9191511,
at *3 n.2 (M.D. Ala. Aug. 14, 2018).   While Thomas's December 2018
stabbing and the circumstances surrounding it are not properly
before the Court in this case, that stabbing is the subject of a
separate lawsuit filed by Thomas against Warden Stewart that is
pending in this Court.   See Thomas v. Stewart, Case No. 1:20-cv-
00302-JB-MU (S.D. Ala. 2020).

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by showing or pointing out to the district court that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-24.

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (quoting

_Celotex_, 477 U.S. at 324).   "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." _LaChance v. Duffy's Draft House, Inc._, 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted).   In other words, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986).

In considering whether the Defendant is entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Thomas.   _See_ _Comer v. City of Palm Bay, Fla._, 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.   A genuine dispute requires more than "some metaphysical doubt as to the material facts."   A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

_Garczynski v. Bradshaw_, 573 F.3d 1158, 1165 (2009) (per curiam) (internal citations omitted).   In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

judgment." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995).   Furthermore, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

## III. <u>DISCUSSION</u>

### A.   **Official Capacity Claim.**

Thomas's complaint does not specify whether he is suing Warden Stewart in her official and/or individual capacities.   (<u>See</u> Doc. 1).   "A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1309 (11th Cir. 2009).   Warden Stewart is a correctional official employed by ADOC, a department of the State of Alabama.   Thus, to the extent Thomas sues Warden Stewart in her official capacity, his claim functionally reduces to a § 1983 claim against the State of Alabama itself.   <u>See</u> <u>Will v. Mich. Dep't Of State Police</u>, 491 U.S. 58, 71 (1989).

The Eleventh Amendment bars Thomas's claim against Warden Stewart in her official capacity.   <u>See, e.g.</u>, <u>Alabama v. Pugh</u>, 438 U.S. 781, 782 (1978); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984) (stating that with some exceptions, "a

suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"; Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are . . . protected by the [Eleventh A]mendment."). Further, state officials sued in their official capacities are not "persons" within the meaning of § 1983, and monetary damages are unavailable for a § 1983 complaint naming state officials in their official capacities. Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1524 (11th Cir. 1995). Thus, to the extent Thomas brings his lack of security claim against Warden Stewart in her official capacity, such claim is barred.

**B.  Individual Capacity Claim.**

To the extent Thomas is suing Warden Stewart in her individual capacity, Warden Stewart has pled the defense of qualified immunity against the allegations asserted against her. (See Doc. 9 at 3; Doc. 17 at 12-14). "The defense of qualified immunity completely protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Marbury v. Warden, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam) (citations omitted). Since the record evidence reflects that Warden Stewart was acting within the scope of her discretionary authority at all

14

relevant times, the burden shifts to Thomas to show (1) that Warden Stewart violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation.[11] See id.

Warden Stewart contends that Thomas has failed to meet his burden with respect to the first qualified immunity prong because he has failed to show a constitutional violation. (Doc. 17 at 14). The Court now turns to Thomas's asserted claim to determine whether the summary judgment evidence shows that Warden Stewart violated a constitutional right.

**C.   Eighth Amendment – Lack of Security.**

As noted above, Thomas seeks redress pursuant to 42 U.S.C. § 1983 for an Eighth Amendment violation based on an attack by a fellow inmate. (See Doc. 1). Section 1983 creates a private right of action against any person acting under the color of state law

---

[11] "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted).  For a right to be clearly established, either (1) "a materially similar case has already been decided"; (2) there is "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." Gaines v. Wardynski, 871 F.3d 1203, 1208-09 (11th Cir. 2017) (quotation omitted).  The controlling authority must be "from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state."  Id. at 1209.

who deprives another of a federal constitutional right.  See 42 U.S.C. § 1983.  The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003); Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999).  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a duty on prison officials "to 'take reasonable measures to guarantee the safety of the inmates.'"  Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer, 511 U.S. at 834.  The Eleventh Circuit has stressed "that a 'prison custodian is not the guarantor of a prisoner's safety.'"  Purcell v. Toombs County, Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond

reasonably to the risk.'" Caldwell, 748 F.3d at 1099 (emphasis in original) (citation omitted).  To survive summary judgment on an Eighth Amendment claim under § 1983, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

The first element — a substantial risk of serious harm — is measured against an objective standard. Caldwell, 748 F.3d at 1099.  Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." Marbury, 936 F.3d at 1233.  "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted).  The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [prison

17

official's] failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quotations omitted).  To meet the objective component, a plaintiff must produce evidence that the defendant "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." Marbury, 936 F.3d at 1233 (citation omitted).  "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Brown, 894 F.2d at 1537.

The third element — causation — requires a plaintiff to "show a 'necessary causal link' between the officer's failure to act reasonably and the plaintiff's injury." Marbury, 936 F.3d at 1233 (citation omitted).

In the current action, Thomas brings suit against a supervisory defendant and makes no claims against officers personally present during the incident.  "It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or respondeat superior." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010).  A supervisory prison official can be held liable under § 1983 only if they personally participated in the unconstitutional conduct or if there is a "causal connection" between the supervisor's actions and the alleged constitutional violation.  West v. Tillman, 496

F.3d 1321, 1328 (11th Cir. 2007) (per curiam).

> A causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so; when the supervisor's improper custom or policy leads to deliberate indifference to constitutional rights; or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008).

Construing Thomas's complaint liberally, he alleges that Warden Stewart acted with deliberate indifference to his safety by failing to have a sufficient number of officers on duty and failing to take measures to properly secure the prison, thereby resulting in him being attacked in Holman's dining hall on May 28, 2019. (See Doc. 1 at 4-5, 8).

In support of her motion for summary judgment, Warden Stewart has produced evidence that she did not act with deliberate indifference to a known substantial risk of serious harm to Thomas on May 28, 2019. First, Warden Stewart has shown that she was not present or on duty at Holman when Thomas was stabbed on May 28, 2019, which Thomas does not dispute. (See Doc. 17-1 at 3, 14-15). Warden Stewart has also testified that she had no prior knowledge or information suggesting there was a specific threat to Thomas before the subject incident. (Id. at 5). Indeed, the record reflects that Thomas himself denied knowledge of why inmate Carter had attacked him, although inmate Carter claimed it was because

Thomas had threatened him with a knife prior to the incident. (Id. at 8, 10). There is no evidence that Thomas and inmate Carter (or any other inmates at Holman) were considered enemies at the time the incident occurred. Nor has Thomas alleged that he apprised Warden Stewart or anyone else that inmate Carter or any other inmate at Holman posed a risk to his health or safety.[12] See McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991) (stating that a plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety"), overruled in part on other grounds by Farmer, 511 U.S. at 828. Thus, no reasonable fact finder could conclude that Warden Stewart acted with intentional or reckless disregard to a known specific risk of harm to Thomas.

---

[12] As noted *supra,* Thomas suggests for the first time in response to the summary judgment motion that because he was stabbed by unknown assailants while asleep in his dorm in December 2018, Warden Stewart should have caused him to remain in segregation until his assailants were identified or transferred him to a different facility. (See Doc. 14-1 at 4-5). Even if this claim had not been improperly raised at the summary judgment stage, it would lack support. First, there is nothing before the Court that suggests that the two incidents are at all related, or that Warden Stewart or anyone else, including Thomas, had any reason to believe that he would be stabbed again if placed in the general population. Notably, Thomas does not allege, and the record does not demonstrate, that he placed anyone on notice that he had enemies in the general population or indicated that he desired to remain in segregation. Further, Thomas's complaint reflects that the May 2019 attack caught Thomas and prison officials alike completely by surprise.

The Court likewise finds that Thomas has failed to put forth probative evidence showing that he faced a generalized, substantial risk of serious harm from inmate violence in Holman's dining hall.  The Eleventh Circuit has declared many times over that a claim of deliberate indifference based on a generalized risk of violence may only be established by showing "that serious inmate-on-inmate violence was the norm or something close to it[,]" which is generally evidenced by "specific features of a facility or its population rendering it particularly violent[,]" such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness."  Marbury, 936 F.3d at 1234-35 (quotation omitted).

In Hale, the Eleventh Circuit determined that the plaintiff had presented sufficient evidence of a generalized, substantial risk of serious harm from inmate violence to survive summary judgment where the record showed that prisoners were not segregated based on their proclivity for violence; there was only one jailer on duty; the jailer's quarters were out of earshot and eyesight of the prisoners' cell; and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization.  50 F.3d at 1581-84.

In <u>Marsh v. Butler County, Ala.</u>, 268 F.3d 1014 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the former inmate plaintiffs had sufficiently alleged conditions posing a substantial risk of serious harm to inmates when they alleged:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.

<u>Id.</u> at 1029. The Court reasoned that, "[t]aken as a whole, these alleged conditions, if true, present an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates. This risk violates the Eighth Amendment's requirement 'that inmates be furnished with the basic human needs, one of which is "reasonable safety."'" <u>Id.</u> (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993)).

The Eleventh Circuit has stressed that Hale and Marsh are not the "proverbial 'floor' of liability for Eighth Amendment purposes" but that the conditions evidenced by the records must be "sufficiently grave to violate the Constitution." Purcell, 400 F.3d at 1323. "Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts." Id. at 1320. The cases below evidence facts courts have considered insufficient to establish that prison conditions "rose to the level of a 'substantial' or 'sufficiently serious' risk as opposed to some lesser risk of harm[,]" given that "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." See id. at 1323 (citation omitted).

In Purcell, the Court determined that the record did not support the plaintiff's contention that jail conditions posed the substantial risk of serious harm necessary for a constitutional violation where the inmates were segregated based on a number of particularized factors (including the type of crime committed and potential personal conflicts with others); the jail was properly staffed (with the typical number of five officers being on duty during the night of the subject attack); officials had a history of addressing and punishing inmate violence; the fights that occurred were not linked to any recurring specific cause; and the

guards testified they periodically walked the cellblock.  Id. at 1321-23.

In Harrison v. Culliver, 746 F.3d 1288 (11th Cir. 2014), the plaintiff adduced evidence of thirty-three incidents of inmate-on-inmate violence involving weapons over the span of three-and-a-half years, four of which occurred in the same hallway where the plaintiff was assaulted, in a prison which housed between 830 and 990 inmates.  Id. at 1299-1300.  The Court concluded that the evidence presented was "hardly sufficient to demonstrate that [the facility] was a prison 'where violence and terror reign.'"  Id. at 1300 (citation omitted).

In Lorenzo v. Williams, 2018 WL 3863529 (S.D. Ga. July 30, 2018), there was evidence that the prison had an average of six inmate-on-inmate assaults per month in a population of 1500-1600 in the year the decedent was attacked.  Id. at *7.  The district court concluded "that these superficial statistics [were] insufficient to demonstrate a substantial risk of serious harm to inmates at [the prison]."  Id.

In Marbury, the plaintiff affirmed that he had personally witnessed fifteen apparently gang-related inmate stabbings prior to the incident in which he was stabbed, had sent a written request to the warden asking to be moved to another dorm (he described his dorm as an "over-rated gang affiliated block"), and had made several more in-person requests to be transferred.  936 F.3d at

1231.  The Eleventh Circuit panel majority found the evidence insufficient to establish deliberate indifference based on a general risk of inmate-on-inmate violence.  Id. at 1235.  The panel majority expounded that in cases where the Eleventh Circuit had previously "held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent."   Id.   The panel majority stated that although the record showed that inmates faced some risk of assaults by fellow prisoners, the plaintiff had failed to identify "specific features of the prison that would make it particularly violent" and "failed to produce evidence that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm."  Id.; but cf. Dickinson v. Cochran, 833 F. App'x 268, 275 (11th Cir. 2020) (per curiam) (finding that the plaintiff sufficiently alleged "specific feature of the jail that render[ed] it particularly violent" where the plaintiff "alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates").

Here, Thomas alleges that a prison guard was fatally stabbed in Holman's kitchen in 2016; that 25 officers resigned as a result; that 236 inmates were stabbed at Holman in the month of September

2016 alone; that 2-3 inmates were stabbed per day in dorms A-D at Holman between 2016 and 2020; that Warden Stewart ordered her officers not to enter the dorms during inmate violence due to the high frequency of inmate-on-inmate stabbings; that the night shift at Holman was "always" understaffed and was particularly short of officers to man the posts in the four dormitories; that the night shift was normally manned by a total of 7-8 correctional officers; that CERT teams were never ordered to augment the night shift despite the understaffing and increased violence during that shift; and that it was "standard practice" to have one officer monitoring between 125 and 150 inmates in Holman's dining hall.  (Doc. 14-1 at 1-3).  Thomas's assertions are not sufficient to show that he faced a generalized, substantial risk of serious harm from inmate violence in Holman's dining hall.

The fact that 25 officers allegedly resigned after a guard was stabbed to death in Holman's dining hall in 2016 is of little moment given the unrefuted evidence regarding the level of staffing at Holman and its dining hall on the morning Thomas was stabbed. Moreover, the record is devoid of evidence that "serious inmate-on-inmate violence was the norm or something close to it" in the dining hall.  See Marbury, 936 F.3d at 1234.  Thomas identifies only one prior incident that occurred in Holman's dining hall, the fatal stabbing of a correctional officer in 2016.  While Thomas's affidavit cites purported statistics regarding inmate-on-inmate

violence at Holman, there are no allegations of violence in the dining hall, aside from the stabbing of the correctional officer in 2016.

Moreover, there is nothing in the affidavit establishing that the statistics asserted by Thomas are based on his personal knowledge, or that he is competent to testify on said matters. As noted *supra*, an affidavit opposing summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.[13]  Fed. R. Civ. P. 56(c)(4).  "[T]he affidavit or declaration must state the basis for such personal knowledge." Carter v. Companion Life Ins. Co., 338 F.R.D. 413, 417 (N.D. Ala. 2021) (quotation omitted).  "For a matter to be considered within a witness's personal knowledge, it must be 'derived from the exercise of his own senses, not from the reports of others—in other words, [it] must be founded on personal observation.'" Riley v. Univ. of Ala. Health Servs. Found., P.C., 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (citation omitted).  "District courts may disregard statements that are not based on personal knowledge or are inadequately supported."  Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc., 793 F. App'x 896, 902 (11th Cir. 2019) (per curiam)

---

[13] The Court informed Thomas of these requirements in the order converting the answer and special report to a motion for summary judgment.  (See Doc. 12 at 3).

(citing <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1278–80 (11th Cir. 2002)).

Thomas alleges no facts suggesting he has personal knowledge or is otherwise competent to testify that "236 inmates were stabbed" at Holman in September 2016, or that "[d]uring 2016-2020, 2-3 inmates were stabbed every single day in the four dorms (A, B, C, and D)." (<u>See</u> Doc. 14-1 at 2). Indeed, it is difficult to imagine how Thomas could possibly have such knowledge of assaults occurring in other dormitories or areas of the prison. Accordingly, the Court does not credit the numbers of stabbings alleged by Thomas as creating a genuine issue of fact regarding a generalized risk of violence at Holman. <u>See</u> <u>Harrison</u>, 746 F.3d at 1299 n.16 (refusing to credit plaintiff's statement made "[t]o the best of [his] belief and knowledge" regarding the numbers of inmate-on-inmate assaults that occurred in a prison hallway because the statement itself showed that the plaintiff did not rely on his personal knowledge of the incidents). Furthermore, the superficial statistics listed by Thomas are almost entirely devoid of context or factual details and provide no information regarding the level of violence in Holman's dining hall.

Taking Thomas's properly supported allegations as true, he has failed to carry his burden of identifying "specific facts" showing "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial

risk of serious harm." See Marbury, 936 F.3d at 1235; Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam). Thomas's allegations establish the "mere possibility" of injury but fail to carry his burden of establishing a "strong likelihood" of injury. See Brown, 894 F.2d at 1537.

Even assuming *arguendo* that Thomas could establish a substantial risk of serious harm in Holman's dining hall, he has failed to adduce facts from which a reasonable jury could conclude that Warden Stewart was deliberately indifferent to such a risk. On the contrary, the record reflects that there were two officers assigned to provide security in the kitchen/dining hall when Thomas was stabbed. (See Doc. 17-1 at 21-22). The record further reflects that one officer witnessed the incident and responded by calling a Code Red, and four additional officers then responded to the incident. (Id. at 8, 10, 13). It also reflects that, after Thomas's assailant refused commands to drop the knife, the officer pepper-sprayed the assailant and retrieved the knife from him. (Id.). Further, the correctional officers obtained prompt medical treatment for Thomas. (Id. at 8, 10-11).

Thomas acknowledges there were officers assigned to monitor the kitchen and dining hall at the time of the incident and does not dispute the account of the incident contained in the institutional reports. (See Doc. 14-1). Instead, he claims, with little explanation and no causal analysis, that there were "three

(3) total officers watching and feeding 460 inmates" during the breakfast meal, and "a total of 6 officers" watching all of the inmates within the prison, thereby implying that Warden Stewart failed to adequately staff the prison.  (See id. at 3).  Thomas's vague allegation regarding the overall staffing level at Holman is negated by the Post Assignment Roster, which reflects that there were 15 officers (not including the Shift Clerk or the five officers assigned to Outside Hospital) on duty during the May 27–28, 2019 night shift.  (See Doc. 17-1 at 15).  Thomas's vague assertion regarding the number of officers monitoring the inmates during the population feeding of the breakfast meal is also contradicted by the record, as it ignores (at minimum) the presence of the cubicle officers.  (See id.).  Further, even assuming there were three officers "watching and feeding 460 inmates" during the breakfast meal, there are no facts to indicate that this amount was objectively insufficient.  "[T]here is nothing inherently wrong with having only a few staff members supervise inmates[.]" Laube v. Haley, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002). Indeed, "the Eighth Amendment does not require the uninterrupted personal supervision of all inmates."  Est. of Owens v. GEO Grp., Inc., 660 F. App'x 763, 773 (11th Cir. 2016) (per curiam).

Finally, Thomas has failed to adduce evidence from which a jury could reasonably find that Warden Stewart's actions were causally related to his stabbing, which took place in the dining

hall and in the presence of at least one correctional officer. Most of the specific security deficiencies alleged by Thomas (the shortage of officers posted in the dorms, officers not entering the dorms during inmate violence, and officers doing taking no action as long as an inmate had a knife in his hand[14]) are unrelated and irrelevant to the subject attack. Thus, to the extent he contends Warden Stewart is liable for these deficiencies, or for understaffing during night shifts at Holman generally, Thomas fails to identify any facts which could demonstrate a causal connection between Warden Stewart's acts, omissions, customs, or policies and his stabbing in Holman's dining hall.

Accordingly, Thomas has failed to establish an Eighth Amendment violation against Warden Stewart, and Warden Stewart is thus entitled to qualified immunity. Therefore, it is recommended that summary judgment be **GRANTED** in favor of Defendant Warden Stewart.

## IV.   CONCLUSION

Based on the foregoing, the undersigned recommends that summary judgment be **GRANTED** in favor of Defendant Warden Cynthia

---

[14] Thomas does not allege that any officer was in a position to intervene to prevent him from being stabbed and failed to do so, and his allegations reflect that the attack took place without warning and was over almost instantly. (See Doc. 1 at 8) ("I was sitting, eating my tray when all of a sudden I felt something hit me in my head than my shoulder . . . I instantly jumped up and turned around and noticed an inmate standing holding an inmate made knife.")).

Stewart on Plaintiff Morris Jermaine Thomas's claims against her, and that this action be **DISMISSED**.

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

<u>**NOTICE OF RIGHT TO FILE OBJECTIONS**</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation

where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

      **DONE** this **2nd** day of **February, 2022.**

                                          **/s/ SONJA F. BIVINS**
                                   **UNITED STATES MAGISTRATE JUDGE**